IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

DEJA GREEN                                                              PLAINTIFF

v.                                              CIVIL ACTION NO. 3:24-CV-233-SA-JMV

UNIVERSITY OF MISSISSIPPI                                               DEFENDANT

ORDER AND MEMORANDUM OPINION

On August, 7, 2023, Deja Green initiated this action by filing her Complaint [1] against the University of Mississippi ("the University"). Green brings racial and sex discrimination claims under Title VII of the Civil Rights Act. Now before the Court are the University's Motion for Summary Judgment [32] and Green's Motion for Partial Summary Judgment [34]. Both Motions [32], [34] have been fully briefed and are ripe for review. Having considered the parties' filings, as well as applicable authorities, the Court is prepared to rule.

*Relevant Factual and Procedural Background*

In the Spring of 2023, the William Magee Center for Alcohol and Other Drugs ("Magee Center"), a department within the University, hired several employees. Relevant to this lawsuit, the Magee Center sought an intervention specialist who would also perform programming work. During the relevant time period, Dr. Natasha Jeter, a Black woman, in her role as Assistant Vice Chancellor for Wellness and Student Success, conducted all interviews and made all hiring decisions for the Magee Center.

In March 2023, Dr. Jeter interviewed three applicants for the intervention specialist position.[1] The three candidates included a White man, a Black man, and a Black woman. Dr. Jeter hired Deja Green, the Black female applicant, because she had the most experience working with

---

[1] An intervention specialist requires a specific educational background and a professional license.

alcohol and drug users. However, Dr. Jeter expressed to Green that she preferred a White male for the position on two occasions. First, during Green's interview, Dr. Jeter allegedly told Green "I wanted a white male for the [] role. . . then you came in and interviewed and we hired you because you were better qualified and more suitable for the position." [38], Ex. 3 at p. 89.[2] The second occurrence was on September 8, 2023, during a meeting between Dr. Jeter and Green about the general condition of the Magee Center. During that meeting, Green voiced complaints about student workers not responding well to her, and Dr. Jeter made another comment about preferring a White male for Green's position.[3]

Thereafter, in September 2023, Dr. Jeter hired Dr. Nicholas McAfee, a White man, as Director of the Magee Center. In this role, Dr. McAfee supervised all employees, including Green, graduate students, and undergraduate student workers. Additionally, Dr. McAfee had the credentials to perform intervention specialist duties.

In early October 2023, several graduate and undergraduate student workers approached Dr. McAfee with multiple complaints about Green's behavior, including the specific complaint that she pinched the same undergraduate student worker on two separate occasions. On October 9, 2023, Dr. McAfee contacted Dr. Jeter about the reported pinching incidents. Dr. Jeter immediately called Hunter Haney, a human resources officer, to discuss her options as to how to proceed regarding Green's continued employment. Haney advised Dr. Jeter that Green was a probationary employee and that the Magee Center could decide not to extend her employment.

---

[2] Dr. Jeter denies she made this comment during the interview.
[3] Dr. Jeter does not dispute she made this comment during the meeting but contends it was made "in a joking manner" and meant to encourage Green in her role.

On October 16, 2023, Green was called into a probationary review meeting with Dr. McAfee, Dr. Jeter, and Haney, during which Green was informed that she was being terminated.[4] During the meeting, Green was not informed of any allegations against her or given an explanation as to her termination. At no point was she asked about or given the opportunity to explain the alleged pinching incidents prior to her termination. Green maintains that she never pinched a student.

The University did not fill Green's position after her termination due to alleged budgetary restraints. Instead, Dr. McAfee took over Green's intervention specialist duties. The University contends that, although it does not have a current plan to fill Green's position due to budgetary restraints, those restraints did not play a role in the termination decision and that Green would still be employed but for the pinching incidents.

Following her termination, Green filed a complaint alleging racial discrimination with the University's Office of Equal Opportunity and Regulatory Compliance ("EORC"). The EORC conducted an investigation and concluded that Green was terminated because of her inappropriate interactions with student workers, not due to her race. Green filed a charge of racial discrimination, and later amended it to include sex discrimination, with the EEOC on December 18, 2023. The University attached the EORC report to its EEOC Position Statement. The EEOC issued a notice of right to sue on July 1, 2024. Green thereafter filed this suit, alleging sex and racial discrimination in violation of Title VII.

The University seeks dismissal of both claims. Green also brings a Motion for Partial Summary Judgment [34], seeking judgment in her favor as to several defenses raised by the University. Both Motions [32, 34] are opposed.

---

[4] Though the University alleges that it received several other complaints about Green, in its briefing it contends that the pinching incidents were the sole basis for Green's termination. [33] at p. 10.

*Legal Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

As noted previously, Green brings two separate Title VII claims against the University—one for sex discrimination and one for racial discrimination. Because it is potentially dispositive, the Court will first address the University's request for summary judgment.

I.      *The University's Motion for Summary Judgment [32]*

Both of Green's claims arise under Title VII. In pertinent part, Title VII provides:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).

Since the parties rely on much of the same evidence in analyzing both of Green's Title VII claims, the Court will analyze them together.

A.  *McDonnell Douglas*

"An employee may rely on direct or circumstantial evidence to establish a prima facie case of discrimination under Title VII." *Arredondo v. Schlumberger Ltd.*, 583 F. Supp. 3d 783, 800 (W.D. Tex. 2022) (citing *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007)). Here, Green relies on circumstantial evidence to establish her sex and racial discrimination claims. *See* [39] at p. 12-13. Thus, the familiar burden-shifting framework set forth in *McDonnell Douglas* applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Under the *McDonnell Douglas* framework, the burden is first on the plaintiff to create a presumption of discrimination by establishing a *prima facie* case. *Id.* at 802, 93 S. Ct. 1817. If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to "articulate some

legitimate, nondiscriminatory reason" for its actions. *Id.* "The burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)). If the defendant carries its burden, then the ultimate burden rests on the plaintiff to prove the employment decision was the result of a discriminatory practice. *McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. 1817.

### B. *Prima Facie Case*

Typically, in order to establish a *prima facie* case of sex or racial discrimination, Green would have to show that "she (1) is a member of a protected class, (2) was qualified for the position that she held, (3) was subject to an adverse employment action, and (4) was replaced by someone outside her protected class or treated less favorably than other similarly-situated employees who were not in her protected class." *Harville v. City of Houston, Mississippi*, 945 F. 3d 870, 874-875 (5th Cir. 2019) (citing *Alkhawaldeh v. Dow Chemical Co.*, 851 F. 3d 422, 426 (5th Cir. 2017)).

The Fifth Circuit has noted that "[t]he prima facie case method established in *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Johnson v. Louisiana*, 351 F. 3d 616, 622 (5th Cir. 2003) (citing *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1984) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978)).

The University does not dispute that Green can satisfy the first three elements of her *prima facie* case. However, the University takes issue with the fourth element, specifically arguing that Green was not replaced and that she cannot meet her burden under an alternative theory. [40] at p.

2-4. In response, Green argues that the University's decision to eliminate the intervention specialist position and have Dr. McAfee absorb her duties establishes the fourth element. The Court will address each argument in turn.

Turning to whether Green was replaced, the University asserts that Green was not replaced after she was terminated; rather, it argues that her position was eliminated and her duties were assumed by Dr. McAfee. It contends that Dr. McAfee and other Magee Center employees assuming Green's job duties is insufficient for Green to establish her *prima facie* burden. The Court disagrees.

The Fifth Circuit has previously held that a plaintiff met her *prima facie* burden when her position was eliminated and her job duties were redistributed among co-workers outside of her protected class. *See Young v. Harris Health Care, Inc.*, 226 F. 3d 643, 2000 WL 1029180, at *1 (5th Cir. 2000). In *Young*, a racial and age discrimination case, the plaintiff, a 51-year-old White woman, was terminated, and her former job duties were split among three new, younger employees. *Id.* Importantly, a Black woman assumed the bulk of the plaintiff's responsibilities. *Id.* at *3. The Fifth Circuit held that the elimination of one position and the redistribution of former job duties to individuals outside the plaintiff's protected class was sufficient for the plaintiff to meet her *prima facie* burden. *Id.* The Court also emphasized the "minimal showing" needed at this stage. *Id.*

The Fifth Circuit has upheld the application of *Young* and addressed the University's present argument in a similar case. *See Howard v. United Parcel Service, Inc.*, 447 Fed. Appx. 626 (5th Cir. 2011). In *Howard*, the plaintiff, a Black man, was demoted for performance issues and the defendant subsequently eliminated his former position. *Id.* at 628. After eliminating the position, the defendant reassigned all the plaintiff's former duties to a single employee, a White

man. *Id.* The defendant argued that the plaintiff could not establish the fourth prong of a *prima facie* case because the position was eliminated after the plaintiff's demotion. *Id.* The Fifth Circuit agreed with the district court's finding that the plaintiff "was 'replaced' when his former job duties were absorbed by a white employee." *Id.* at 629.[5] In making this finding, the Fifth Circuit included a footnote addressing the defendant's argument which states:

> UPS argues the district court erred in finding the fourth prong was met because the position held by Howard was eliminated following Howard's demotion. Citing unpublished cases from this court and several district courts, UPS argues that when a position is eliminated, the job duties are absorbed by other existing employees, and no additional employees are hired, a *prima facie* case is not established because Howard was not "replaced" by someone outside the protected class. While this court has acknowledged differences between job "replacement" and "elimination" cases, those distinctions are more clearly applicable when the case involves layoffs or employer-planned reductions in force as opposed to the elimination of the single job at issue, such as here. *See Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 149–50 (5th Cir.1995). *Because the record reflects that only Howard's specific position was eliminated and his duties were assumed by someone outside the protected class, Howard has made a prima facie showing of discrimination.*

*Id.* at n. 2 (emphasis added).

Applying the analysis in *Young* and *Howard*, this Court finds the University's argument unpersuasive. Green can show she was "replaced" when others not in her protected class assumed her duties. Because the record reflects that only Green's specific position was eliminated and her duties were assumed by someone outside her protected class, she has established for summary judgment purposes that she was "replaced."

---

[5] The district court, relying on *Young,* concluded that "[w]hen Mr. Howard was demoted and his responsibilities were absorbed by another, non-African American manager, he met the requirements of a *prima facie* case." *Howard,* 2011 WL 195682, at *5 (citing *Young,* 2020 WL 1029180, at *3).

Arguing to the contrary, the University cites *Ernst v. Methodist Hosp. Sys.*, where the Fifth Circuit held in part that "an employee has not been replaced when his former duties are distributed among other co-workers." *Ernst v. Methodist Hosp. Sys.*, 1 F. 4th 333, 339 (5th Cir. 2021) (citing *Griffin v. Kennard Indep. Sch. Dist.*, 567 F. App'x 293, 294-95 (5th Cir. 2014)). This quote, however, must be viewed in the proper context. In *Ernst*, the Fifth Circuit noted that the plaintiff failed to correctly allege and identify the race of the co-workers who assumed his responsibilities. *Id.* at n.5. The court's finding rested heavily on the fact that the plaintiff only alleged that his job was *offered* to someone outside his protected class, and the court found this allegation was unsubstantiated and speculative. *Id.* at 339.

Here, it is undisputed that Dr. McAfee, a White man, assumed *all* of Green's intervention specialist duties. [38], Ex. 2 at p. 76; 122-123. Further, the defendant in *Ernst*, unlike in this case, did not claim to have eliminated the plaintiff's position. As the Court explained above, this distinction is important. For the purposes of establishing a *prima facie* case, the Court finds that Green has met her "very minimal" burden. *Owens v. Cicassia Pharms., Inc.*, 33 F. 4th 814, 825 (5th Cir. 2022).[6]

## C. Legitimate Non-discriminatory Reasons

The burden now shifts to the University to provide a legitimate, non-discriminatory reason for the employment decision. *See Moss v. BMC Software*, 610 F. 3d at 917, 922 (5th Cir. 2010). At this stage, the University's burden is simply to produce, "evidence, which taken as true, would permit the conclusion that there was a non-discriminatory reason for the adverse action." *Ruth v. Eka Chemicals, Inc.*, 92 F. Supp. 3d 526, 531 (N.D. Miss. Feb. 17, 2015) (quoting *Price v. Fed.*

---

[6] Green argues she satisfies her burden under two alternative theories, which the University contests. Because the Court finds she met her burden under the traditional fourth element, the Court need not address the alternative arguments.

*Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002)) (additional citation and emphasis omitted). The University proffers one legitimate, non-discriminatory reason for terminating Green—the report she pinched a student worker.

Importantly, the University is "not required to persuade the court that it was actually motivated by the proffered reasons. . . It must only clearly set forth, through the introduction of admissible evidence, the reasons for its decision." *Ruth*, 92 F. Supp. 3d at 532 (quoting *Turner v. Kansas City S. Ry. Co.*, 675 F. 3d 887, 901 (5th Cir. 2012)) (additional citation and internal quotation marks omitted). This step involves no credibility assessment. *Heinsohn v. Carabin & Shaw, P.C.,* 832 F.3d 224, 236 (5th Cir. 2016). For summary judgment purposes, the University has satisfied its burden.

### D. *Pretext*

The burden now shifts back to Green to establish pretext. *See Moss*, 610 F. 3d at 922. "At the third step, the employee must produce evidence, or rely on evidence already produced, that refutes or contests the employer's evidence of a legitimate, nondiscriminatory reason. Stated differently, the employee must produce or rely upon evidence that the employer's legitimate, non-discriminatory reason was only a pretext—that is, a false or weak reason . . . advanced to hide the actual . . . reason." *Id*. at 236-237 (citing BLACK'S LAW DICTIONARY (defining 'pretext'); *Tex. Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)) (quotation marks omitted). The evidence must be of sufficient "nature, extent, and quality" to permit a jury to reasonably infer discrimination. *Owens*, 33 F. 4th at 826 (citing *Crawford v. Formosa Plastics Corp., La.*, 234 F. 3d 899, 902 (5th Cir. 2000)).

In her Response Memorandum [39], Green argues the University's legitimate, non-discriminatory reason is pretextual and false or unworthy of credence. Green points to the

following circumstantial evidence to show pretext: (1) Dr. Jeter's comments, (2) suspicious timing, (3) the University's investigation, and (4) the same actor/class inference. The Court will address the relevant points in turn.[7]

### i. Dr. Jeter's comments

Green first argues that Dr. Jeter's comments about wanting a "White male" for the intervention specialist position proves that the University's legitimate, non-discriminatory explanation for its termination decision is pretextual.[8] The University contends that the comments, in context, lack discriminatory animus.

When considering discriminatory comments in an indirect evidence case, as opposed to a direct evidence case, courts apply a less demanding standard because "the discriminatory remarks are just one ingredient in the overall evidentiary mix." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F. 3d 470, 475 (5th Cir. 2015). Under this less demanding standard, the plaintiff must show that the comments involve "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Squyres v. Heico Cos*. L.L.C., 782 F. 3d 224, 236 (5th Cir. 2015).

Here, there is no dispute that Dr. Jeter was primarily responsible for Green's termination and that she made a comment about wanting a White male for the position during a meeting held on September 8, 2023. However, there is a dispute over whether she made a similar comment during Green's hiring interview.

---

[7] Green additionally argues that the University has presented no admissible evidence to support its position. The Court rejects this argument because at the summary judgment stage, evidence need only be capable of being "presented in a form that would be admissible in evidence." *Dugas v. Ace American Ins. Co.*, 469 F. Supp. 3d 769, 772 (5th Cir. 2020) (citing *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F. 3d 530, 534 (5th Cir. 2016) (quoting FED. R. CIV. P. 56 (c)(2)). Therefore, so long as the evidence is capable of being presented in an admissible form, it should be considered at this stage of the proceedings.
[8] To be clear, Green does not argue that the comments should be considered direct evidence of discrimination.

Green testified about both comments during her deposition. First, she testified about the comment that Dr. Jeter allegedly made during her hiring interview:

> Q.   Okay, the statement here under this first bullet point is, quote, I would prefer to have a white male in this role. What makes you qualified?
> Is that your recollection --
>
> A.   Correct. Yes.
>
> Q.   -- of what she told you?
>
> A.   Yes.
>
> Q.   Okay, And that's – that's in quotes. When I see quotes, I typically think somebody is saying this is exactly the words that were said. Is that exactly or close to exactly the words that were said?
>
> A.   Yes.

[38], Ex. 4 at p. 120.

Green then testified to the context in which the alleged comment was made:

> Q.   Okay. So can you explain to me the context – I know this says you were talking to her for an hour. There's no recording. I'm not going to ask you to recite everything that was said during that hour, but explain to me what the context for this particular statement is. What did she say before that? What did she say after that? What did you understand she meant by saying that?
>
> A.   Before this statement was made, basic introductions were made, and she asked me about my resume, things that I had – my history, things that – people I've worked with, things that I've accomplished. She started to describe the population that the William Magee Center served, and as she was discussing the population, she talked about some of the day-to-day problems they may run into. That's when she made the statement, I would prefer a white male in this position. What makes you qualified? Because the William Magee Center works with primarily fraternity, Greek life, fraternities and sororities, white males and females.

*Id.* at 121-122.

When asked about this alleged comment made during the hiring interview, Dr. Jeter denied

making the comment at that time and testified:

> Q.     … you feel like you remember the interview well enough to say you did not tell Ms. Green you wanted a white male for the position. Is that what you're saying?
>
> A.     What I'm saying is, yes, I – I recall telling Deja – or making that statement to Deja, but it was not in her interview.
>
> Q.     Okay. When did you make that statement to her?
>
> A.     I recall -- or having a conversation with Deja about work after she was hired, and talking about the work that she was doing – the good job that she was doing, and said, initially, I wanted a white male for the whole role because I felt that they would be the most qualified. Then you came and interviewed and we hired you because you were better qualified and more suitable for the position.

[38], Ex. 3 at p. 88-89.

Thus, Dr. Jeter denied making any statement whatsoever about a preference for hiring a

White male during Green's hiring interview but conceded that she did make a comment to Green

during a meeting that occurred after Green's employment had commenced. During her deposition,

Green testified about this meeting, and the context in which Dr. Jeter made the undisputed "White

male" comment:

> Q.     Okay. Okay. Let me move to the next bullet point that says, The same statement was made to me again after Dr. Jeter returned from her medical leave. On Friday, September 8, 2023, at 10:00 inside the Lyceum, Plaintiff met with Dr. Jeter to give a general update of the progress of the William Magee Center. During this meeting Dr. Jeter stated, you know I prefer a white male.
>
> Okay. I'm going to try to ask you the same type of question I had asked you before. Obviously that was not the only thing that was said in that meeting, correct?

13

> …
>
> A.    I can't recall the entire conversation at that point, but I do remember the statement being made in a joking manner, and so perhaps she felt comfortable with me to say that as I was sharing with her some of the things that I was experiencing while she was out.

*Id.* at 126-129.

The record shows there is no dispute that on at least one occasion Dr. Jeter told Green that she preferred a White male for the position. Dr. Jeter explained she thought a White male would be the "most qualified" because the demographic of students predominately served by the Magee Center was White male fraternity students. Even considering the University's explanation, a reasonable jury could infer discriminatory animus. On the other hand, a reasonable jury could find no discriminatory animus because Dr. Jeter ultimately hired Green over a White male applicant, which potentially weighs against a finding of discriminatory animus.

Ultimately, whether Dr. Jeter's comments demonstrate discriminatory animus on her part is a question of fact for the jury, not this Court. The Court considers these comments as "one ingredient" in the evidentiary mix and now turns to the remaining evidence. *Goudeau*, 793 F. 3d at 475.

### ii.    *Suspicious timing*

Green argues that the timing of her termination is suspicious and should be considered in the circumstantial evidentiary mix. The Fifth Circuit has held that suspicious timing of a termination when combined with other evidence can support a finding of pretext. *Myers v. Crestone Intern., LLC*, 121 Fed. Appx. 25, 28 (5th Cir. 2005) (citing *Shackleford v. Deloitte & Touche, LLP*, 190 F. 3d 398, 409 (5th Cir. 1999)) ("the combination of suspicious timing with other significant evidence of pretext[] can be sufficient to survive summary judgment").

A review of the timeline is important to this analysis. In May 2023, Dr. Jeter allegedly made a comment about wanting a White male during Green's hiring interview. On September 5, 2023, Dr. McAfee, a White man who had the credentials to perform invention specialist duties, began working at the Magee Center. On September 8, 2023, Dr. Jeter again made a comment about wanting a White male for the position. On October 16, 2023, Green was terminated. Following the termination, the University decided to eliminate that position due to alleged budget restraints. During the University's Rule 30(b)(6) deposition, Dr. McAfee (on behalf of the University) testified:

> Q. ... as we sit here today, [] there's no intervention specialist in McGee Center?
>
> A. There is not.
>
> Q. Why is that?
>
> A. That role was essentially having it being filled, there was no budget for it, and were running a massive budget deficit. Nearing six figures which beyond what our University budget was. So had we tried to rehire there would, there – there's financially no possibility of doing that from that perspective.

[38], Ex. 2 at p. 71-72.

Despite the elimination of the position, an intervention specialist was still needed for the University's alcohol and drug education program known as RebelADE.[9] Dr. McAfee testified:

> Q. RebelADE, you say it's mandated?
>
> A. Yep.
>
> Q. And when you say, mandated, does that mean that the University has – it's mandated by the University's policy, is that what you mean by that?

---

[9] The University through the Office of Student Conduct requires students to go through the program following alcohol and drug related incidents.

A.    It is – it's – I think it fulfills part of the University policy as determined by our Office of Student conduct.

…

Q.    Is there any other sort of law – or regulation or anything you're aware of that requires this alcohol and drug program at the University, IHL rules, something like that?

A.    I believe there's a federal mandate to make sure there's some alcohol related education available to students on campus.

…

Q.    Have you decided sort of to permanently reorganize so that you won't have an intervention specialist, or is this something that you're going without involuntarily because you're starving for money?

…

A.    Yeah, So it's been working in the currently with me having a license, being able to provide supervision to students who come through that, and I have long history of providing that supervision.

*Id.* at 74-76.

According to the uncontroverted testimony of the University, RebelADE is a mandated program that requires a licensed intervention specialist. Following Green's termination, the only person with the requisite license was Dr. McAfee, who had been hired roughly a month prior and subsequently assumed all of her intervention specialist duties. Instead of hiring a new intervention specialist, the University alleged it was running at a "massive budget deficit" and decided to eliminate the position and allow Dr. McAfee to continue the fulfill the mandatory duties. [38], Ex. 2 at p. 76. A reasonable jury could find the timing of Green's termination and Dr. McAfee's hiring suspicious and indicative of pretext, especially when viewed in combination with Dr. Jeter's comments.

16

###### iii.     *The University's investigation*

Next, Green argues that the University's failure to make reasonable inquiries to her about the alleged pinching incidents and its admission that the pinching allegations "haven't been proven to [the University]'s satisfaction" shows pretext. *Id.* at 124-126. Green maintains she never pinched a student.

The Fifth Circuit has held that an employer's investigatory choices, depending on the facts of a particular case, can be suspicious in a way that renders the "defendant's explanation … unworthy of credence and permits an inference of discrimination." *Owens*, at 828-829 (quoting *Reeves*, 530 U.S. at 147, 120 S. Ct. 2097).  In cases in which an employer discharges an employee based on the complaint of another employee, the issue is not the truth or falsity of the allegation, but "whether the employer reasonably believed the employee's allegation and acted on it in good faith." *Jackson v. Cal-Western Packaging Corp.*, 602 F. 3d 374, 379 (5th Cir. 2010) (citing *Waggoner v. City of Garland*, 987 F. 2d 1160, 1165 (5th Cir. 1993)).

Green first points out that the University did not inform her of the allegations against her when she was fired nor was she given the opportunity to deny or explain her version of events.[10] The Fifth Circuit has held an employer's failure to give an employee a chance to explain her conduct can create a jury issue of pretext. *See Laxton v. Gap Inc.*, 333 F. 3d 572, 581 (5th Cir. 2003) (holding, in a Title VII case, that evidence was sufficient to create jury issue on pretext when, among other things, the plaintiff's "supervisors never gave [the plaintiff] the chance to explain her conduct or improve it" prior to terminating her). On this point, Green testified:

---

[10] Green argues that Samantha Shirley, another female employee who is White, was given an opportunity to explain herself when accusations were made against her by certain student and graduate student workers. Green claims that this differential treatment is indicative of pretext. The University contends that the Court should not consider the treatment of Shirley because she and Green were not similarly situated. In light of the other evidence presented, the Court sees no need to address this issue at this stage in the proceedings.

Q. Okay. So you go to that meeting. It's the end of the day. Tell me everything you remember about that meeting.

…

A. Then the meeting started. He [Haney] made the statement [terminating Green]. I asked why, and he said he wasn't at liberty to tell me.

And that was it. And I asked Dr. Jeter and Nick [Dr. McAfee] what was going on, and they didn't respond either.

[38], Ex. 4 at p. 139-141.

This testimony is consistent with that of other termination meeting attendees. When asked about the termination meeting, Dr. Jeter testified:

Q. Okay. Anything else you remember about her reaction?

A. I recall her being surprised and asking – or attempting to ask more detailed questions.

Q. What was the response when she asked for more detail?

A. I recall us not providing detail.

…

Q. And so, in fact, you never spoke with her about the claims against her, right?

A. No.

[38], Ex. 3 at p. 73-74.

In addition to being denied the chance to explain the alleged pinching incidents before her termination, Green argues that Dr. McAfee (on behalf of the University) made statements that show the University did not believe that Green pinched a student. When asked about the investigation into the pinching incident, Dr. McAfee (on behalf of the University) testified:

18

Q.     Can you think of any reason that it would be a bad idea for her to come back to the University of Mississippi as an employee in a job she was well-qualified for?

A.     You know, it's – this would all be based off of allegations. So if I were to make any comment on that, it would be based on things that I can't verify. But, so in terms of facts that we have determined for sure through a formal investigation, I – I'm not really aware of anything that would preclude that from happening.

Q.     [W]hen you were talking about allegations, are you referring to students saying that Ms. Green pinched and poked them?

A.     As part of the other allegations, but yes, that's part of it.

Q.     Okay. So if I understand your answer correctly, it's saying those were allegations presented, but they don't *they haven't been proven to your satisfaction that that's actually what happened?*

A.     *Yeah*. There's nothing in – there's been no follow up outside of the questions I've asked. So I don't, all I know is what I've been told.

Q.     Right. And no one took a statement from Ms. Green, right?

A.     That I'm aware of, no.

[38], Ex. 2 at p. 125-126 (emphasis added).

In response, the University, relying on *Jackson*, argues that Green's denial of the students' underlying allegations is insufficient to overcome summary judgment and that it need only show it reasonably believed the allegations and acted in good faith. *Jackson*, 602 F. 3d at 379.

In *Jackson*, an employee who was terminated over allegations of sexual misconduct claimed his firing was a pretext for age discrimination based, in part, upon his denial of committing any misconduct. *Id*. Addressing the employee's denial, the Fifth Circuit explained:

Jackson's self-serving statements that he did not commit sexual harassment are insufficient to create a triable issue of fact as to whether Cal–Western fired him because of his age. In cases in which

an employer discharges an employee based on the complaint of another employee, the issue is not the truth or falsity of the allegation, but whether the employer reasonably believed the employee's allegation and acted on it in good faith. Cal–Western was faced with considerable evidence that Jackson was violating the company's sexual harassment policy. The evidence came from several employees, both male and female, and was substantiated by both an internal and external investigation of Jackson's behavior. Jackson has presented no evidence as to why the company's reliance on the evidence against him was in bad faith. His own conclusory assertion that he did not behave inappropriately is irrelevant, since he has provided no evidence to suggest that Cal–Western's decision to trust the results of the two investigations, rather than his self-serving denial of wrongdoing, was unreasonable or in bad faith. Jackson's assertion of innocence alone does not create a factual issue as to the falsity of Cal–Western's proffered reason for terminating him.

*Id.* (footnotes, citations, and quotations omitted); *see also Deanes v. North Mississippi State Hosp.*, 2013 WL 1293794 at *5-6 (N.D. Miss. Mar. 26, 2013).

Here, the accusations against Green came solely from student and graduate student workers. Dr. Jeter described these student workers as "hav[ing] thoughts and complaints about everything." [38], Ex. 3, at p. 51. The Court acknowledges that Dr. McAfee interviewed several student workers about the allegations against Green. However, the University stated its legitimate, non-discriminatory reason for firing Green was specifically the pinching incidents. [33] at p. 10. Thus, the only relevant consideration is whether the University reasonably believed the pinching incidents occurred and acted in good faith when relying on them in making the termination decision.

Prior to informing Dr. Jeter of the alleged pinching incident, Dr. McAfee interviewed several students about Green. *See* [40], Ex. 1. Dr. McAfee's notes from those meetings only included a reference to the pinching incidents by one student. *Id.* at p. 2. The EORC report states "that HR (human resources) did not investigate but had notes on what led to termination." [32],

20

Ex. 5 at p. 5.[11] Meaning, the termination, unlike in *Jackson*, was based solely on the testimony of one student worker and was not substantiated by any other employees. Also differing from *Jackson*, there is evidence here, in the form of the University's 30(b)(6) deposition indicating that the University did not actually believe the student's allegations against her. [38], Ex. 2 at p. 125-126.

Green has presented evidence that she was terminated based on the uncorroborated testimony of one student worker, never given a chance to explain herself, and the University admitted the allegations were not proven to its satisfaction. This raises a question of fact as to whether the University reasonably believed the allegations against Green and acted in good faith in terminating her employment. A reasonable jury could find that, based on the University's investigatory choices, including its failure to give Green a chance to explain herself, the University's reason for Green's termination is false or unworthy of credence.

### iv. Same actor/class inference

The University argues that because Dr. Jeter is a Black woman and she hired and terminated Green, it is entitled to the "same actor" and "same class" inference. The Fifth Circuit has defined the "same actor" inference as "a presumption that animus was not present where the same actor responsible for the adverse employment action either hired or promoted the employee at issue." *Spears v. Patterson UTI Drilling Co.*, 337 Fed. Appx. 416, 421-422 (5th Cir. 2009). This inference is stronger when the same supervisory employee hires and fires a plaintiff within a short period of time and "even stronger where the supervisory employee are members of the same protected

---

[11] As Green notes, there appears to be some inconsistency in statements made by Dr. Jeter recorded in the EORC Report as compared to her deposition. However, the EORC investigation occurred post-termination and, for the purposes of this analysis, is not relevant in determining whether the University's legitimate, non-discriminatory reason for the termination decision was pretextual.

class." *Grelle v. City of Windcrest*, 539 F. Supp. 3d 657, 667 (W.D. Tex. May 12, 2021). This presumption is rebuttable. *Id.*

To the extent the University claims the "same actor" and "same class" inference weighs in its favor, the Court need not determine at this stage whether it is entitled to that presumption. *See Odunze v. Methodist Hosp.*, 2025 WL 2423658 (S.D. Tex. Aug. 20, 2025). As the Fifth Circuit has cautioned, this inference is rebuttable and merely weighs against the evidence of discrimination. *See Spears*, 337, Fed. Appx. at 422. As discussed above, based on Green's *prima facie* case of discrimination combined with evidence of pretext, the Court determined that there exists genuine questions of material fact as to whether her termination was motivated by race or sex discrimination. Accordingly, the Court cannot apply the "same actor" inference because it is prohibited from weighing evidence at this stage. *See Grelle*, 539 F. Supp. 3d at 667 (declining to consider "same actor" inference on summary judgment where plaintiff met his burden).

At this juncture, "the question is not whether [Green] proves pretext, but rather whether [she] raises a genuine issue of fact regarding pretext." *Amburgey v. Corhart Refractories Corp., Inc.*, 936 F. 2d 805, 813 (5th Cir. 1991). She has done so. Overall, considering the evidence casting doubt on the University's proffered reason for terminating Green, a reasonable jury could infer discrimination. The Court finds that Green has created a question of fact as to pretext.

II.    *Green's Motion for Partial Summary Judgment [34]*

Green seeks partial summary judgment as to all but one of the University's affirmative defenses. The University argues that the Motion [34] should be dismissed in its entirety.

In a Title VII case for racial discrimination, this Court has recently addressed a similar motion and held:

> This court notes that plaintiff has filed a rather unconventional motion for partial summary judgment, in which he takes issue with

22

> numerous affirmative defenses raised by defendant in its answer. This court has rarely seen plaintiffs file such motions, and it believes that they are generally unnecessary. In so stating, this court notes that, in its experience, many civil defendants routinely include a laundry list of affirmative defenses out of an abundance of caution, often copied and pasted from other cases. For this reason, this court generally does not pay a great deal of attention to affirmative defenses, unless and until it becomes clear that they will be an issue at trial.

*Shams v. Delta State Univ.*, 681 F. Supp. 614, 629 (N.D. Miss. July 10, 2023).[12]

The same logic applies here. The Court will not address each affirmative defense substantively at this juncture.

*Conclusion*

For the reasons set forth above, the Motions [32, 34] are DENIED. Green will be permitted to proceed to trial on both of her claims.

SO ORDERED, this the 10th day of December, 2025.

/s/ Sharion Aycock_____
SENIOR UNITED STATES DISTRICT JUDGE

---

[12] In *Shams*, the plaintiff brought nearly all the same substantive arguments as in the present motion.

23